At a Court of Oyer and Terminer held at this term Aaron K. Woodward was indicted and tried for the murder of William T. Lukens of the first degree. The case was tried before Wootten, Houston and Wales, Associate Judges, Gilpin, Chief Justice, absent on account of sickness. The prisoner resided on a farm in Christiana hundred, a few miles from the City of Wilmington, upon which on the 6th day of October preceding there was a chestnut tree with ripe nuts on it growing in one of the fields about fifty yards from the public road leading by it, and on the trunk of which he had fixed a written notice only a few days before forewarning all persons against trespassing upon it, or his premises. One of the number named Edward Speakman, engaged in the trespass hereafter mentioned, and a witness for the State in the trial of the prisoner, on cross-examination testified that there were about twenty boys of them including himself in the city of Wilmington, some of whom, were in the habit of making weekly excursions *Page 456 
on foot out of the city into the country round about it, at suitable seasons of the year, and of taking almost anything they could find without leave or license from the farmers in the neighborhood, but that day was the first time he had ever been himself in Mr. Woodward's field. The party that day consisted of six, but was larger than usual. He went with the deceased and four other boys out to the farm of the prisoner that day, and into his field and to the chestnut tree from the public road about 10 o'clock in the morning. The deceased and two others of them, John Skelly and William T. Green, went up the tree, while he and the other two remained under it. The tree was in full view of the prisoner's house, and about a quarter of a mile from it, and which was on higher ground than the tree, but when he first saw the prisoner he was in a run coming out of a piece of woods nearer to the tree than his house, with a double barrelled gun in his hand, and was hallooing to the boys to come down out of the tree, and who was then only about fifty yards from them. The witness then ran off from the tree and out of the field into the public road, where he stopped and looked back when he saw the prisoner, after he had reached the tree and the deceased had come down from it and was running off from it towards the woods, level and aim his gun from his shoulder at him and fire, and the deceased immediately fell in the field about ten yards from the tree. And which statement was substantially corroborated by the testimony of the other two who were under the tree with him, and fled from it to the public road on the approach of the prisoner. John Skelly also testified that he was the second, but did not remember which of the other two was the first to go up the tree, and the first he heard of the prisoner was his hallooing, but he did not see him until he got under the tree, when he raised a double barrelled gun and pointing it up the tree, told them if they did not come down, he would blow their brains out, when they told him if he would let them come down and would not shoot, they would do so and go off, and never come back anymore; *Page 457 
and that the deceased as he went down the tree was crying and begging him not to shoot him, but just before he got down the prisoner struck him with a stick which broke, when they both jumped to the ground and ran off together towards the woods, the deceased a little ahead and to the left of him, when they were both shot, he in the left arm and the deceased in the back, and who at once fell, but he, the witness, ran on. Green who had not yet come entirely down from the tree also substantially confirmed this statement, and added that he saw the prisoner raise the gun to his shoulder, point at the deceased and fire and saw him fall. It was also proved that the ages of the boys varied from fifteen to nineteen years, the deceased being the oldest, but not the largest of them. The prisoner then walked to Lukens and helped him upon his feet, but he could not walk and he let him down again on the ground in the grass, and went to his house and soon returned with a horse and dearborn and one of his hired men, and put him in the dearborn and carried him to his house and laid him on a settee, and soon afterwards sent another of his hired men on a horse to Wilmington for a physician, with a request that he would come out to his house as soon as possible, as there was a boy there who had got hurt; in the meanwhile he and his wife and her sister living with them, doing the best they could to relieve him of the pain and prostration under which he was suffering; but the physician not arriving, and the boy all the while expressing a desire to go home to his mother, he was taken three or four hours afterwards by the prisoner and his hired man in the dearborn to his father's house in Wilmington, where he died the next morning between 9 and 10 o'clock.
The testimony of the physician was that he was called to see him about 3 o'clock P. M. on the 6th of October last, and found him in a very feeble and collapsed condition, and his pulse so fast and feeble that he could not count it, and that it would not do to administer chloroform, or to probe his wounds but slightly, until his system *Page 458 
had rallied somewhat, but it never rallied, and only grew weaker up to his death. The post mortem examination of his body made the next day disclosed that the wound was a gun-shot wound with small shot in the back below the shoulder blade, but mainly or more on the right than on the left side of the spinal column, and rather transversely across the back, and that seventy-two apertures made by that number of shot, were found in his back. The shot were all small shot, and that both the stomach and the left lobe of the lungs were penetrated by them; and that the wound of the stomach was necessarily fatal, and would have killed any boy or man.
The evidence for the prisoner was that there were a few shot recently fired apparently from a gun into the chestnut tree and scattered over a surface of about six inches up and down the body of it, and about four feet from the ground, and that it was thirteen yards from it to the place where the deceased fell after he was shot. That there had been the day before, and early in the morning of that day, a written notice placed on the body of the tree forewarning all persons from trespassing on the premises, and that after the shooting of the deceased, one of the boys was seen to go back to the tree and raising his hand up the body of it take or remove something from it, apparently, and in the afternoon there was no notice on it; and that the prisoner had always borne the character of a good and peaceable citizen, without any skill or practice in the use of a shot-gun, or other fire-arm.
During the examination of a neighboring farmer as a witness in the case, the following question was propounded to him by the counsel for the prisoner.
Do you know that gangs of marauders infested that neighborhood, and that they often went armed, and were in the habit of committing frequent depredations on the farmers there, even in an open and defiant manner, taking their property, and not only threatening, but actually resorting to personal violence against them when ordered *Page 459 
from their premises, and that the prisoner was well aware of that fact at the time of this occurrence?
The indictment which you are now trying is against Aaron K. Woodward, the prisoner at the bar, for the murder of William T. Lukens in Christiana hundred in this county, on the sixth day of October last, with express malice aforethought, and consequently, of the first degree under our statute. It charges him with no other crime, but under it you may acquit him of the crime of murder in the first, and convict him of the crime of murder of the second degree under the statute, or acquit him of murder of either degree, and convict him of the crime of manslaughter; or acquit him entirely, according as the evidence shall warrant and require when you come to apply to the facts and circumstances proved in the case, the law on the subject as stated by the Court.
At common law the crime of murder consists of but one degree, the malice, however, which is always absolutely *Page 460 
essential to constitute it, is of two kinds, and are respectively termed, in the legal definition of them, express malice aforethought, and malice aforethought implied by law; and so far as this distinction is concerned, our statute merely makes the crime when committed with express malice aforethought, or in perpetrating or attempting to perpetrate any crime punishable with death under our laws murder of the first degree, but when committed with implied malice aforethought, murder of the second degree, the penalty thereby prescribed for it being death, when it is of the first degree, and fine, whipping, pillory and imprisonment for life when it is of the second degree. At common law the penalty was death whether committee with express, or with implied malice, and therefore the distinction was practically of much less importance then under this modification introduced into it by our statute. Some of our sister States which have also modified it in this and other respects, have made the intention to kill, the gist, or the essential ingredient and criterion of murder in the first degree and punishable with death. We have however in this State no law defining or establishing the crime of murder of either degree, but the common law distinction as recognized here when our statute was enacted.
It must be observed, however, that when the common law as well as the statute, makes use of the term malice aforethought in this connection, as the peculiar characteristic of the crime of murder, as distinguished from manslaughter and other grades of homicide, it is not to be understood in its ordinary sense or meaning, as denoting actual hatred or animosity entertained by one person against another, but as indicating that the killing is attended with such circumstances as arc the ordinary symptoms of a wicked and malignant spirit, a heart regardless of social duty and fatally bent on mischief; and in general, any formed design of doing mischief may, in this sense, be called malice. And therefore not such killing only, as proceeds from premeditated hatred or revenge against the *Page 461 
person killed, but in many other cases, such killing as is accompanied with circumstances that show the heart to be perversely wicked, is adjudged to be of malice prepense, or express malice aforethought, and consequently, murder with such malice at common law, and of the first degree under our statute.
The long established and familiar definition of express malice aforethought at common law, is when one person kills another with a sedate, deliberate mind and formed design, such formed design being evidenced by external circumstances discovering the inward intention, such as lying in wait, antecedent menaces, former grudges, and concerted schemes to do the party some bodily harm. According to this definition it is not necessary that the design formed with a sedate, deliberate mind should be to kill, to constitute express malice aforethought at common law, or under the statute, but it is sufficient for that purpose, if the deliberate mind and formed design simply be to do the party some bodily harm, and his death ensues as the result of it. Implied malice, or malice implied by law, to constitute the crime of murder at common law, and under our statute, is when the act is not done with a sedate, deliberate mind and formed design, and is not so evidenced as before stated, but it is implied by law from any deliberate, cruel act committed by one person against another however suddenly without any, or without a considerable provocation, sufficient in law to negative the implication of malice in such a case; as where one person kills another suddenly, without any or without such a considerable provocation as is sufficient to negative such implication of malice, and to mitigate and reduce the killing to the crime of manslaughter, the next degree of offense in the descending grade of unlawful and felonious homicide; for in contemplation of law to constitute the crime of voluntary manslaughter, or an act of intentional killing of one person by another, the provocation and alleviation must be such as to negative both express and implied malice. The essential characteristics therefore which distinguish *Page 462 
the crime of murder with malice implied by law, and of the second degree under the statute, from the crime of murder with express malice aforethought, and of the first degree under the statute, on the one hand, and from the crime of voluntary manslaughter on the other, consist in the suddenness with which it is committed without any sedate, deliberate mind and formed design to kill, or to do the party some bodily harm, and without any, or without a considerable provocation sufficient in law to alleviate and reduce the killing to the crime of manslaughter as before mentioned.
The crime of manslaughter consists in the unlawful killing of one person by another without malice, either express or implied, as before defined, as when it is done suddenly in a transport of passion and the heat of blood upon a reasonable provocation such as the law has recognized in well considered and adjudged cases, without premeditation or previously former design, and without any other hatred malevolence or animosity than such a provocation was naturally calculated to incite under the circumstances attending the act; for in such a case the law in its benignity and indulgence for the common weakness of our nature, considers it solely imputable to human infirmity, and not to malice in the sense in which it is employed with reference to the crime of murder at common law, or of either degree under our statute. But the provocation to have this effect must be of such a character as reasonably to produce such a sudden transport of passion, or heat of blood, as to impel the party without premeditation or previously formed design, and before he has had time to cool or for reason or reflection to regain control over the transport of passion which impels him to the commission of the act. But the law, even in its benignity and indulgence for this common infirmity of humanity, does not consider any provocation, whatever, as sufficient to negative or rebut the existence of express malice when it satisfactorily appears from the evidence in the case, or even, the implication of malice when the facts and circumstances *Page 463 
proved clearly warrant it; and therefore the law and the decisions on this point go to this extent only, first, in case of a mutual combat or fight between the parties, not preconcerted between them, as in a duel, and one of them, in the heat of blood produced by it suddenly kills the other without premeditation, and before there is sufficient time for the passion to subside, it will be but manslaughter; and yet, even in such a case, though there is not time for passion to subside, if it be attended with such circumstances as indicate malice aforethought in the slayer, he will be guilty of murder at common law, and of the first or second degree under our statute, according as the jury may find the malice to have been either express malice aforethought, or malice implied by law, as before defined by us. In all other cases where the killing is done upon provocation, it must appear that the provocation was considerable, and not slight only, in order to reduce the offense to manslaughter; and in general, without an assault actual or menaced on the person of the party killing, the provocation will not be sufficient to reduce it to manslaughter, if a deadly weapon be used: but if the fatal stroke is given by the hand only, or with a small stick or other instrument not likely to produce death, a less provocation will suffice to reduce the offense to manslaughter. Thus, the killing has been held to be only manslaughter, though a deadly weapon was used, where the provocation was pulling the nose of the party killing by the party killed; so where one person meets another on the street and intentionally and rudely jostles him to one side, and the latter in the heat of blood suddenly kills him with a deadly weapon, the provocation has been held sufficient to reduce such killing to manslaughter. So where a boy having had a fight with another boy and been badly beaten by him, ran home bloody and crying to his father, who immediately seized a rod or stick not likely to produce death, and ran three-quarters of a mile to where the other boy was, and struck him one blow on the head with it, of which he afterwards *Page 464 
died, the provocation was deemed sufficient to reduce the offense to manslaughter. But even, where the provocation has been given by a blow too slight to reduce the killing to manslaughter, yet if it is accompanied by words and gestures calculated to produce a degree of exasperation equal to what would be caused by a violent blow, it has likewise been held to be sufficient to reduce the offense to manslaughter. There are also other provocations recognized in law to be sufficient to reduce the offense of killing to manslaughter, as in the special case expressly provided for in our statute where the killing is by a husband of a person found in the act of adultery with his wife, and another kind of provocation which sometimes arises in the execution of process by public officers, as where the process is essentially defective or illegal, or is being executed in an illegal manner, and the party in protecting and defending himself against the arrest, kills the officer, the provocation will be sufficient to reduce the killing in such case to manslaughter. But these, and some other cases of a similar character which might be mentioned, will be found to constitute the only cases in law in which any provocation given, or any wrong done by one person to another, (not sufficient to entirely excuse or justify the killing of the former by the latter,) in which provocation with or without heat of blood, has been held sufficient to reduce the homicide to the grade of manslaughter.
But in all these cases of voluntary homicide upon provocation and in the heat of blood in which they have been held sufficient to reduce the killing to manslaughter, it must further appear from the evidence that the fatal blow was given or wound inflicted before the passion originally raised by the provocation, had time to subside, or the blood to cool; for it is only to human frailty that the law allows this indulgence, and not to settled malignity of heart. If, therefore, after the provocation, however great it may have been, there is time for passion to subside, and reason to resume its sway before the mortal *Page 465 
blow or wound is given, it will be murder, as we have before said, and not manslaughter. And upon this point it is also further to be observed that in such cases of homicide as we have just been speaking of, upon provocation, or in a sudden fight between the parties, if there be evidence of actual malice, the offense will also be murder, as we have before remarked, and not manslaughter. It must therefore appear that the chastisement, or act of force intended on the part of the slayer, bore some reasonable proportion to the provocation received, and did not proceed from brutal rage or diabolical malignity. Proof of great provocation is requisite to extenuate the offense and reduce it to manslaughter, where the killing is by a deadly weapon, or by other means likely to produce death; but if no such weapon or means be used, a less degree of provocation will suffice.
But inasmuch as it has been contended by the counsel for the prisoner, that it is incumbent upon the prosecution to prove and establish to the satisfaction of the jury, the guilt of the prisoner to the extent of either murder of the first or second degree, or of manslaughter, or he must be acquitted, we must say to you that if you are satisfied from the evidence in the case that the prisoner shot the deceased, William T. Lukens, in the manner alleged in the indictment, and that his death the clay afterward was the result of that shooting, the fact of such killing, particularly, as it was done with a shot gun, a deadly weapon, is presumed in law to have been committed by him with malice, and to be murder with implied malice, and of the second degree under the statute, unless you are also satisfied from the evidence that he did it in the heat of blood and upon a provocation given him by the deceased sufficient in law to rebut this implication of malice, and to reduce the killing to the offense of manslaughter.
We have already, however, sufficiently stated and explained to you the nature and character of the provocation which is required in law for this purpose, and we will therefore now say to you that no mere trespass or aggression *Page 466 
on the real or personal property of another, and no such wrong or injury committed on them, as was then being committed by the deceased and his companions on the premises of the prisoner, however annoying or provoking they have been to him, could constitute in law a sufficient provocation to reduce the killing of such a trespasser or wrong-doer by the owner of the premises from murder to manslaughter, when it is done with a deadly weapon, or with any other means likely to produce death. And no notice or warning posted anywhere on the premises forbidding all persons against trespassing upon them, and no statute of the State, if there be such, making such trespasses indictable misdemeanors, could have any effect, either directly or indirectly, to vary or modify this well settled principle of law on the subject.
On this particular point the law is so clearly stated in a work of high authority on crimes as recognized at common law that we will read it. Where A, finding a trespasser upon his land, in the first transport of passion, beat him and unluckily killed him, and it was holden to be manslaughter, it must be understood that he beat the trespasser, not with a mischievous intention, but merely to chastise him, and to deter him from any future commission of such a trespass. For if A had knocked his brains out with a bill or hedge stake, or had killed him by an outrageous beating with an ordinary cudgel, beyond the bounds of a sadden resentment, it would have been murder; these circumstances being some of the genuine Symptons of the mala mens, the heart bent upon mischief, which enter into the true notion of malice in the legal sense of the word. Moir, the accused, having been greatly annoyed by persons trespassing upon his farm, repeatedly gave notice that he would shoot any one that did so, and at length discharged a pistol at a person who was trespassing, and wounded him in the thigh, which led to erysipelas, and the man died, being indicted for murder he was convicted and executed. It seems, therefore, adds the author referred to, that it may be laid down that in all cases of *Page 467 
slight provocation, if it may be reasonably collected from the weapon made use of, or from any other circumstance, that the party intended to kill, or do some great bodily harm, such homicide will be murder. 1Russ. on Crimes, 519. And yet, with the practical distinction introduced by our statute, as the malice prepense is implied from such circumstances in such cases, and there was provocation, but not such as was sufficient to reduce the homicide to manslaughter, it would constitute murder committed with implied malice aforethought, and of the second degree only under the statute. This principle of the common law which we have just stated was recognized and ruled in Halloway'sCase where a boy was trespassing with others in a park and was caught by Halloway, the Woodward of it, up a tree with a rope tied around his body and one end of it hanging down, and cutting boughs from the tree with a hatchet, who on his coming down by his command tied the end of the rope to the tail of the horse on which he was riding through the park, and without any resistance on the part of the boy, struck him two blows on his back with his cudgel, which caused the horse to run away and drag him on the ground, by which he was killed; and in which case all the judges of England held, with one dissenting opinion, that inasmuch as there was no resistance made by the boy, the law in such case implies malice, and that the killing was murder with implied malice aforethought. Cro. Car. 131.
Of course, gentlemen of the jury, all that we have said to you on the law of this case, proceeds and is predicated upon the presumption that the shooting of the deceased, William T. Lukens, by the prisoner at the bar, was wilfully done by him, and if you are so satisfied from the evidence, and that his death was the result of that shooting, then it was unlawfully done, and the law consequently presumes that the killing was committed with malice by him, unless you have evidence before you in the case sufficient in law according to the exposition which we have given you of it on the subject, to satisfy your minds *Page 468 
to the contrary; and of which under the solemn sanction of your oath and the grave and solemn duties devolved upon you as jurors in the case, you are now the sole and final judges between the prisoner and the State. If, however, you have any evidence before you to satisfy you that the shooting of the deceased was not willfully and intentionally done by the prisoner, it will be your duty to acquit him entirely. And furthermore, if after fully and conscientiously considering all the facts and circumstances proved in the case, you should have a reasonable doubt of the guilt of the prisoner, if will be your duty to give him the benefit of such reasonable doubt.
 Verdict — "not guilty."